**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Raymond P. Moore**

Civil Action No. 14-cv-00653-RM

GERI L. CONNORS

      Plaintiff,

v.

CAROLYN W. COLVIN,
Acting Commissioner, Social Security Administration,

      Defendant.

---

**ORDER**

---

## I.    PROCEDURAL HISTORY

Plaintiff Geri Connors (Plaintiff), applied for social security disability insurance benefits

(benefits) on July 29, 2008, alleging disability as of April 11, 2007.  (ECF No.7-2, p.20, 200-02,

211-12).  Her claims were initially denied in March of 2009.  (ECF Nos.7-2, p.20; 7-4, pp.96-

98).  On May 1, 2009, plaintiff filed her request for an administrative hearing.  (ECF No.7-4,

pp.101-102).  She was granted a hearing before an administrative law judge (ALJ), appeared,

testified and was represented by an attorney at the hearing on May 19, 2010.  (ECF No. 7-2,

pp.60-73).  In a decision dated June 2, 2010, the ALJ denied Plaintiff's application for benefits

finding Plaintiff not disabled through September 30, 2009.  (ECF No. 7-3, pp. 79-86).

The Plaintiff requested review of the ALJ's denial and the Appeals Council in an opinion

dated January 18, 2012, vacated the decision and remanded it to the ALJ for: (1) consideration of

the unadjudicated period from October 1, 2009 through June 30, 2010; (2) clarification of

Plaintiff's residual functional capacity (RFC) specifically regarding the frequency and length of

time Plaintiff needed to alternate between sitting and standing; and (3) reconciliation of the RFC

sit and stand limitations with the opinions of Drs. Smith and McElhinney.  (ECF No. 7-3, pp.92-

94).  Upon remand, the ALJ was also directed to: (1) adjudicate the period through June 30,

2010; (2) give further consideration to Plaintiff's maximum RFC during the entire period at issue

and provide rationale with specific references to the record – specifically to Drs. Smith and

McElhinney's opinions; (3) give further consideration to whether Plaintiff was capable of

performing her past relevant work; (4) obtain (if warranted ) supplemental evidence from a

vocational expert (VE) to clarify the effect of those limitations on Plaintiff's occupational base in

support of assessed limitations; and (5) offer the Plaintiff the opportunity for a hearing.  (ECF

No. 7-3, p.93).

In compliance with the Council's order, plaintiff was granted another hearing.  (ECF

No.7-2, pp.35-47).  At the May 2, 2012 hearing, Plaintiff appeared, testified and was represented

by an attorney.  *Id.*  A VE also appeared and testified.  (ECF No. 7-2, p.46).

The ALJ again denied plaintiff's application for benefits on May 29, 2012.  (ECF No.7-2,

pp.20-28).  This denial became the Commissioner of Social Security's (Commissioner) final

decision on January 8, 2014, when the Appeals Council denied plaintiff's appeal of the ALJ's

decision.  (ECF 7-2, pp. 1-3).  Plaintiff now seeks review of that final decision.  (ECF No.1).

## II      FACTUAL HISTORY

### A.    Social History

Plaintiff was born on July 8, 1966.  (ECF 7-5, p.200).  At the time of filing Plaintiff was

married and had three children under age 18.  (ECF No.7-5, p.201).  She had completed two

years of college in 1987, did not attend any special education classes or have any special job training, trade or vocational school.  (ECF NO. 7-6, p.276).

### B.    Medical History

On April 11, 2007, Plaintiff's alleged onset of disability, Dr. Lalonde performed a hysteroscopic resection of polyps and endometrial oblation on Plaintiff.  (ECF No. 7-7, pp.357-60).  Several months later in July, 2007, Plaintiff had x-ray imaging of her back performed because of her complaints of lower back pain.  (ECF No. 7-7, pp.327-28).  These x-rays of her sacrum and lumbar spine were within normal limits.  *Id.*

Plaintiff continued to complain of pain and on August 13, 2007, Plaintiff had MRI imaging of her sacrum, coccyx, lumbar spine, abdomen and pelvis performed.  (ECF No. 7-7, pp.323-25).  The MRIs were unremarkable revealing: mild sacroiliitis in her right sacroiliac joint; a normal lumbar spine despite some mild ligamentous and facet hypertrophy; a possible ovarian cyst and a possible nabothian cyst.  (ECF No. 7-7, pp. 223-25).  On October 24, 2007, Dr. Lalonde performed a vaginal total hysterectomy, mid-urethral sling and cystoscopy because of Plaintiff's continuing complaints of pain, severe dysmenorrhea and urinary stress incontinence.  (ECF No. 7-7, pp.330-35).

On November 26, 2007, Plaintiff saw Dr. Sanford for an initial psychiatric evaluation. (ECF No. 7-7, p.376).  Dr. Sanford diagnosed Plaintiff with: panic disorder; recurrent and moderately severe major depression; generalized anxiety disorder, chronic pelvic pain, moderately severe stress; a current GAF score of 60 and prescribed Cymbalta for her symptoms. *Id.*  The following month on December 4, 2007, Dr. Sanford changed Plaintiff's prescription to Zoloft.  (ECF 7-7, p.375).  Several weeks later Plaintiff presented complaining of anxiety and depression and Dr. Sanford changed Plaintiff's prescription to Seroquel.  (ECF No. 7-7, p.374).

Plaintiff was reported to be unable to tolerate "even minor medication side effects" when seen on January 8, 2008. (ECF No. 7-7, p.373). On January 28, 2008, Dr. Sanford changed Plaintiff's medication to Buspar, wanted to rule out rheumatoid/autoimmune disease that could be exacerbating Plaintiff's psychiatric symptoms and recommended that Dr. Bamberger consider referring Plaintiff to a rheumatologist for workup of Plaintiff's joint pain and nodules. (ECF No. 7-7, p.372).

In February, 2008, Plaintiff was admitted into a two-week day program at the Meier clinic. (ECF No. 7-7, pp.336-343). On discharge the largely illegible clinic notes reflect that Plaintiff's physical pain, depression and anxiety had decreased due to medication and education of techniques. (ECF No. 7-7, p.336).

When next seen by Dr. Sanford on March 13, 2008, Plaintiff was "doing much better" despite still having "significant pain down her buttocks" and Dr. Sanford assessed Plaintiff's GAF as 65 with severe anxiety. (ECF No. 7-7, p.371). Plaintiff had seen a rheumatologist who thought she might have psoriatic arthritis but had not prescribed any definitive treatment. *Id.* Dr. Sanford therefore recommended seeking a second rheumatology opinion. *Id.*

On April 4, 2008, Plaintiff reported she felt she was doing much better and her back pain was less. (ECF No. 7-7, p.370). Dr. Sanford assessed Plaintiff's GAF score as 65 – severe anxiety. *Id.* On April 17, 2008, Plaintiff saw Dr. Day for an initial evaluation. (ECF No. 7-8, p.444). Dr. Day diagnosed Plaintiff with "diffuse arthritic pain thought to be degenerative with likely some overlying fibromyalgia." *Id.* She prescribed an anti-inflammatory and physical therapy for Plaintiff's lower back pain. *Id.*

Ms. Kenens M.P.T., first evaluated Plaintiff six days later on April 23, 2008. (ECF 7-7, pp. 406-407). Ms. Kenens found Plaintiff had range of movement of 50% on both lumbar

flexion and bilateral side bending of 50% with complaints of increased pain while doing them; good SI joint mobility and 5/5 strength of her bilateral quadriceps, 4/5 bilateral hip abduction; tightness and pain to palpation of her back and complaints of pain with pressure on her lumbar spine and when twisting. *Id.* When seen by Dr. Sanford later that same day, Plaintiff reported she was working at a car dealership and complained of a headache as well as back and pelvic pain. (ECF No. 7-7, p.369). Dr. Sanford stopped Plaintiff's Cymbalta and prescribed Wellbutrin and Ultram, again recommended ruling out a rheumatologic/autoimmune disease that could be exacerbating her psychiatric symptoms and assessed Plaintiff's GAF score at 65. *Id.*

At her April 28, 2008 physical therapy visit, Plaintiff reported that she had been doing her exercises and was very sore after her last visit. (ECF No. 7-7, p.404). On May 6, 2008, Plaintiff reported to her physical therapist that she felt weak and had experienced some "popping" in her right hip. (ECF No. 7-7, p.402). On May 9, 2008, Plaintiff returned to Dr. Day for follow-up and reported that she still had "quite a bit of low back and right hip pain" but thought her physical therapy was "doing some good" and the Ultram was helping with her pain control. (ECF No. 7-8, p.442). At her physical therapy appointment on the same day, Plaintiff also reported that she was having pain. (ECF No. 7-7, p.401).

On May 13, 2008, Plaintiff told her physical therapist that she felt a little better although her hips were stiff. (ECF No. 7-7, p.400). The next day, on May 14, 2008, Plaintiff reported to Dr. Sanford that she was in severe pain and developed anxiety every afternoon. (ECF No. 7-7, p.368). As a result, Dr. Sanford increased Plaintiff's Xanax and Wellbutrin. *Id.*

At Plaintiff's May 16, 2008 physical therapy appointment, Plaintiff reported that she had a lot of pain the previous several days but was somewhat improved that day. (ECF No. 7-7, p.399). On May 20, 2008, Plaintiff reported to her physical therapist that she had continuing

pain in her hips and back but felt she was somewhat improved from her previous visit.  (ECF No. 7-7, p.396).  Plaintiff reported continuing hip pain to her physical therapist on May 28, 2008. (ECF No. 7-7, p.395).  The physical therapist recommended continuing treatment and consideration of use of a TENS unit on her abdomen and upper thigh.  *Id.*

On June 2, 2008, Plaintiff reported to her physical therapist that she was experiencing a lot of hip pain.  (ECF No. 7-7, p.394).  Plaintiff reported to Dr. Sanford on June 5, 2008, that she felt emotionally drained and her back was hurting severely because she had been carrying her injured three-year-old son more than usual, that the Wellbutrin was making her worse so she had stopped taking it and while she did have "some daytime anxiety" it was "manageable."  (ECF No. 7-7, p.367).  Dr. Sanford gave Plaintiff the names of two physiatrists[1] to consider.  *Id.*  That same day, Plaintiff reported to her physical therapist that her back pain was radiating down her legs.  (ECF No. 7-7, p.393).

Four days later on June 9, 2008, Plaintiff saw Dr. Bissell[2] for an initial evaluation of her mid-back, low back and bilateral lower limb pain.  (ECF No. 7-7, pp. 435-437).  Plaintiff reported that her pain was constant, occurred on a daily basis and seemed to be worsening.  (ECF No. 7-7, p.435).  She reported that her pain is 80% in her back and 20% in her legs and traveled to both feet.  *Id.*  Plaintiff estimated that lifting and sitting aggravated her pain the most and estimated her sitting, standing and walking tolerance at 10 minutes.  *Id.*  She reported her pain was 6/10 while at the evaluation, 4/10 at rest and 8+/10 with activity.  *Id.*  At that time she reported that she was working five hours per week.  (ECF No. 7-7, p.436).  Dr. Bissell advised her to begin isometric lumbar strengthening exercises, to continue physical therapy and added

---

[1] A physiatrist is a medical doctor or a doctor of osteopathic medicine who specializes in Physical Medicine and Rehabilitation utilizing a wide variety of nonsurgical treatments for the musculoskeletal system and who can diagnose and treat both acute pain and chronic pain.
[2] Dr. Bissell is board certified in Physical Medicine and Rehabilitation.

Cymbalta to her medications.  (ECF 7-7, p.437).  Plaintiff decided to "hold off on injections" to her lumbar medical nerve branch, right SI joint and greater trochanter bursa.  *Id.*  That same day at physical therapy, Plaintiff reported that she was having a lot of lower back and hip pain.  (ECF No.7-7, p.392).

On June 12, 2008, Plaintiff reported that she had less pain, but was anxious and Dr. Sanford assessed Plaintiff with a GAF score of 65.  (ECF No. 7-7, p.366).  That same day at physical therapy, Plaintiff reported she was having less pain overall.  (ECF No. 7-7, p.391). Plaintiff reported to her physical therapist on June 19, 2008, that her hip and back pain was improving.  (ECF No. 7-7, p.390).

On June 26, 2008, Plaintiff reported to Dr. Sanford that her pain was decreasing although her headaches were increasing and Dr. Sanford assessed her with a GAF score of 67.  (ECF No. 7-7, p.365).  That same day, at physical therapy, Plaintiff reported her hip and back pains were improving.  (ECF No. 7-7, p.389).

On July 10, 2008, Plaintiff saw Dr. Bissell for a follow-up evaluation and ultrasound guided bilateral greater trochanter bursa injections which she tolerated well.  (ECF No. 7-7, p.431).  At that time her main complaint was aching and burning pain in both hips.  *Id.*  She had no new pain or neurologic symptoms but stated her pain was severe, daily and worsening.  *Id.* Dr. Bissell recommended that Plaintiff "continue physical therapy, lumbar isometric strengthening exercises" and Cybalta.  (ECF No. 7-7, p.432).  Plaintiff deferred lumbar medial branch blocks, right SI joint and greater trochanter bursa injections.  *Id.*

At physical therapy on July 15, 2008, Plaintiff reported that she was having a lot of lower back pain despite her recent injections.  (ECF No. 7-7, p.388).  Plaintiff returned to see Dr. Bissell for follow-up on July 21, 2008, where she described a sudden onset the previous Saturday

of numbness and tingling in her right lower limb with aching pain in her lower back and pain of 7/10 at that time, 4/10 at rest and 8/10 with activity.  (ECF NO. 7-7, p.428)  Dr. Bissell recommended right SI joint and lumbar medial branch blocks be set up as soon as possible; Plaintiff agreed.  (ECF No. 7-7, p.429).  The next day, July 22, 2008, Plaintiff reported to her physical therapist that she had been improving but on Saturday had experienced terrible back pain and right buttock pain that radiated down her leg which was only relieved by lying flat on her stomach.  (ECF No. 7-7, p.386).  Plaintiff stated she went to an Urgent Care where she received a shot of Toradol for the pain.  *Id.*

Plaintiff saw Dr. Sanford on July 24, 2008, at which time she reported that she had left her husband, was experiencing severe pain and Dr. Sanford assessed her with a GAF score of 67. (ECF No. 7-7, p.364).  The next day on July 25, 2008, while at physical therapy, Plaintiff complained of pain in her back and hips radiating down her right leg to her toes.  (ECF No. 7-7, p.385).  Four days later on July 28, 2008, Plaintiff told her physical therapist that she felt somewhat improved although she still had lower back and right hip pain so had not been doing much housework.  (ECF No. 7-7, p.383).

On July 29, 2008, Dr. Bissell injected Plaintiff's right intra-articular sacroiliac joint and blocked her right lumbar (L2, L3, L4, and L5) medial nerve branch.  (ECF No.7-7, pp.424-425). Plaintiff reported a decrease in her pain from 7/10 to 5/10 post-procedure and was discharged home.  (ECF No. 7-7, p.425).  Dr. Bissell saw Plaintiff for follow-up on August 11, 2008, when she reported her lower back pain was improved (4/10 currently, 3/10 at rest and 6/10 with activity), despite a negative reaction to the nerve block.  (ECF No. 7-7, p.421).  Plaintiff thought her pain might have improved more but she had been very active after the injection when she took a vacation to Sun Valley with her husband and children.  *Id.*

On August 12, 2008, Plaintiff returned to physical therapy where she reported that her back hurt the whole time she was on vacation. (ECF No. 7-7, p.382). On August 14, 2008, while at physical therapy, Plaintiff reported right hip pain, some back pain and significant pelvic floor pain. (ECF No. 7-7, p.381). Plaintiff followed up with Dr. Sanford on August 21, 2008, where she reported that she and her husband had reconciled but she was experiencing very severe and disabling pain. (ECF No. 7-7, p.363). Dr. Sanford assessed her GAF score at 67. *Id.*

At her August 22, 2008, physical therapy appointment, Plaintiff stated she had a lot of pain in her back and hips and planned to get another injection on August 26, 2008. (ECF No. 7-7, p.380). On August 26, 2008, Dr. Bissell injected Plaintiff's left SI joint with anesthetic. (ECF No. 7-7, pp. 416-420). Plaintiff reported a decrease in her left joint pain from 7/10 to 4/10 and requested a repeat right greater trochanter bursa injection which Dr. Bissell administered using ultrasound guidance. (ECF No. 7-7, p.417). On August 28, 2008, Plaintiff told her physical therapist that the injection had not helped as much this time so she was still having "lots" of lower back and hip pain. (ECF No. 7-7, p.379).

Dr. Day saw Plaintiff on September 3, 2008, who she opined, seemed better than before however, while the steroid injections helped they wore off and the pain came back. (ECF No. 7-8, p.440). Plaintiff agreed that she felt fairly stable and did not need different antidepressants. *Id.* Dr. Day planned to refer Plaintiff for breast reduction surgery believing that the surgery could help Plaintiff's back pain. *Id.* At physical therapy that same day, Plaintiff reported that she was having less pain since her injections but had continuing lower back and hip pain. (ECF No.7-7, pp.377-378).

Plaintiff saw Dr. Bissell on September 11, 2008, reporting that she got pain relief for only two to three days following the last injections. (ECF No. 7-7, pp.411-413). Dr. Bissell told

Plaintiff that he had nothing further to offer her from an interventional pain standpoint.  (ECF No. 7-7, p.412).  He opined that her clinical presentation was beginning to sound more like fibromyalgia or diffuse soft tissue pain of some sort.  *Id.*  Dr. Bissell recommended that Plaintiff follow up with Dr. Day and possibly have a rheumatologic workup.  *Id.*  He also opined that breast reduction would do little to help her low back pain.  *Id.*

Dr. Smith conducted a consultative examination of Plaintiff on February 28, 2009.  (ECF No. 7-8, pp.455-462).  Plaintiff reported that at that time, she was in no acute distress, that her lower back pain had not responded to her multiple steroid injections, that she had overall generalized pain throughout her back, arms and legs and that her pain was made worse with bending, flexing and extending her back.  (ECF No. 7-8, pp.455-456).  She also reported she had poor sleep without medications and had muscle spasms in her lower back with cramping in her hands, thighs, shoulders and lower back 2-3 times each day which were relieved by her muscle relaxant medications.  (ECF 7-8, p.456).

Dr. Smith found that Plaintiff had tenderness to palpation along her sacroiliac joint, cervical and lumbar paraspinal muscles; had multiple positive trigger points but had 5/5 grip strength.  (ECF 7-8, p.460).  He diagnosed Plaintiff with: fibromyalgia with 18/18 trigger points elicited on examination and recommended follow-up with a rheumatologist for further assessment and treatment.  (ECF No. 7-8, p.461).  Dr. Smith believed that Plaintiff's pain on palpation of her sacroiliac region seemed out of proportion to the intensity of palpation however, opined that this could be in relation to her suspected fibromyalgia.  *Id.*  He opined that while the muscle relaxants eased Plaintiff's spasms her history of fatigue and lack of energy might be worsened by these medications.  *Id.*  Dr. Smith opined that Plaintiff would be able to: stand or walk about two hours in an eight-hour day; sit about six hours in an eight-hour day; lift and carry

about 10 to 20 pounds occasionally; should have limited crouching and bending but had no manipulative limitations.  *Id.*

That same day, (February 28, 2009), Lynne Gillick, Ph.D. saw Plaintiff in consultation. (ECF No. 7-8, pp.450-454).  Plaintiff reported that she was not currently working because of her chronic pain however she was able to do minimal household chores, did the household cooking and shopping.  (ECF 7-8, p.451).  Plaintiff reported some anxiety around running errands, that she saw friends on a weekly basis, was frequently fatigued, and believed that she had lost strength, stamina and mobility.  *Id.*  Plaintiff rated her chronic pain at 6/10 that day and reported being able to sit for one hour, and stand and walk for 30 minutes.  (ECF No. 7-8, pp.451-452). Dr. Gillick diagnosed Plaintiff with chronic major depression and assessed her GAF score at 55. (ECF 7-8, p.453).  Dr. Gillick concluded that Plaintiff continued to experience depression exacerbated by her altered lifestyle of decreased activity and chronic physical pain and recommended that Plaintiff consult with a psychologist to help with her pain management, and consult with Dr. Sanford regarding her medications and the possible cognitive confusion she was experiencing.  (ECF 7-8, p.454).

Plaintiff also had an X-ray of her lumbar spine and pelvis on February 28, 2009.  (ECF 7-8, p.464).  Reading those X-rays, Dr. Lauro found minimal lumbar degenerative disease, slight scoliosis and an otherwise unremarkable spinal series.  *Id.*

On March 19, 2009, Dr. McElhinney evaluated Plaintiff after his record review.  (ECF No.7-8, pp.466-473).  He found Plaintiff's exertional limitations as: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least two hours in an eight-hour workday, sit (with normal breaks) about six hours in an eight-hour workday and to have unlimited push/pull ability other than noted above.  (ECF No. 7-8, p.467).  He assessed her

11

postural limitations as having the ability to: frequently climb ramps/stairs; frequently balance or stoop and occasionally kneel or crawl. (ECF No. 7-8, p.468). Dr. McElhinney opined that Plaintiff's allegations of pain and muscle spasms were credible and supported by her medical record however that he disagreed with some medical conclusions with regard to her standing/walking limitations because Plaintiff "indicate[d] no limit on walking, just that it hurts" and opined that his limitation of three to four hours of standing or walking was appropriate. (ECF No. 7-8, p.472).

On March 20, 2009, Dr. Dyde's psychiatric record review (of records from April 11, 2007 to that date) concluded that plaintiff's psychiatric impairments were not severe but that Plaintiff had affective disorders characterized by major chronic depression. (ECF 7-8, pp.478-488). Dr. Dyde assessed Plaintiff's functional limitations as: none with respect to activities of daily living, mild difficulties maintaining social functioning, concentration, persistence or pace and having no episodes of decompensation. (ECF No.7-8, p.485). He noted that he had considered Dr. Gillick's report, Dr. Meier's records, Dr. Sanford's notes and Plaintiff's daily activities in his conclusions. (ECF No.7-8, p.488).

Plaintiff presented to Dr. Carroll on September 11, 2009 for evaluation of her hip and back pain which had recurred and possible steroid injection of those areas. (ECF 7-8, pp. 530-532). Plaintiff reported she had a flare-up in May 2009, received steroid injections and was pain-free for two months. (ECF no. 7-8, p.530). Dr. Carroll's examination revealed bilateral point tenderness over her trochanteric bursa and sacroliliac joints. *Id.* Dr. Carroll applied ice packs and performed joint injections in her affected bursa and joints. (ECF No. 7-8, p.531).

On October 21, 2009, Dr. Carroll examined Plaintiff who presented for re-evaluation and treatment of her lower back pain and weight gain secondary to medication. (ECF 7-8, pp.526-

529).  Dr. Carroll applied ice packs and orthopedic strapping to alleviate Plaintiff's pain and spent considerable time counseling Plaintiff.  (ECF No. 7-8, p.528).

On December 18, 2009, Plaintiff again presented for Dr. Carroll's reevaluation and treatment.  (ECF No. 7-, pp.518-519).  On that date, Plaintiff complained of back pain that had wakened her from sleep last night.  *Id.*  Dr. Carroll injected Plaintiff's trigger points which she tolerated well.  *Id.*

Dr. Carroll re-evaluated Plaintiff on January 8, 2010.  (ECF No.7-8, pp.515-517). Plaintiff presented with an acute pain flare-up and reported that her physical therapist believed her lower back pain and tightness had worsened.  (ECF No. 7-8, p.515).  Dr. Carroll treated her with joint injections in both hips and cold pack application which Plaintiff tolerated well.  (ECF NO. 7-8, p.517).  He also prescribed a trial of Neurontin to ascertain whether her pain was neuropathic.  (ECF No. 7-8, p.516).  Plaintiff returned for re-evaluation on January 22, 2010. (ECF No. 7-8, pp.512-514).  Dr. Carroll prescribed various pain medications, referred Plaintiff to Dr. Leppard for pain management and increased her anti-depressant medication.  *Id.*

Dr. Leppard saw Plaintiff in consultation on February 1, 2010.  (ECF 7-8, pp.495-497). At that time, Plaintiff complained of constant bilateral low back pain worse on the right that radiated to her buttocks and inguinal region, numbness and tingling in both legs and toes and rated her back pain as 4/10 at rest and 9/10 with activity.  (ECF No. 7-8, p.495).  On examination, Dr. Leppard found: diffuse tenderness throughout Plaintiff's lumbar and buttock regions, worse over her SI joints and hips; painful trunk flexion and extension and severe tenderness of both psoas muscles, right worse than left.  (ECF No. 7-8, p.496).  Dr. Leppard referred plaintiff to a physical therapist with SI joint and psoas region expertise.  *Id.*

The physical therapist evaluated Plaintiff on February 9, 2010 and assessed Plaintiff as moving in a very guarded fashion, having difficulty moving from sitting to standing, having reduced mobility due to pain and with very tight psoas with bilateral tenderness.  (ECF No. 7-8, pp.504-505).  She planned to see Plaintiff one to two times each week for manual therapy, dry needling and core stabilization.  (ECF NO. 7-8, p.505).  She also recommended that Plaintiff have a gynecologic consult to evaluate Plaintiff's complaints of pelvic floor weakness and congestion.  *Id.*  Plaintiff attended physical therapy on: February 15, 2010, with complaints of a flare-up of pain following cleaning her bathroom (ECF No. 7-8, p. 502-503); Feb 18, 2010 , with complaints of right hip and pelvic pain worse because of driving the day before (ECF No. 7-8, p.502); February 22, 2010 sating her back pain was much improved (ECF No. 7-8, p.501); February 25, 2010 with complaints of increased back and rectal pain and pelvic pressure (ECF No. 7-8, p.500); March 2, 2010 stating she had a really good weekend, was able to clean her house without much pain (ECF No. 7-8, p.500); and March 8, 2010 with complaints of more low back pain but stating she was overall better with fewer flare-ups (ECF No. 7-8, p.499).

Dr. Dunn saw Plaintiff for a urogynecologic consultation on March 12, 2010.  (ECF 7-8, pp.507-508).  On examination Dr. Dunn found Plaintiff had a small cystocele and rectocele (vaginal hernias of her bladder and rectum) and had extreme pain posteriorly where an enterocele (a vaginal hernia of the small bowel) would be.  (ECF No. 7-8, p.508).

Plaintiff was again treated in physical therapy on: March 16, 2010 complaining she was very sore after pelvic exam but sacroiliac joints felt good so she was able to ski one day (ECF No. 7-8, p.498); and March 18, 2010 with complaints of increased low back and sacroiliac pain (ECF No. 7-8, p.498).

Plaintiff was seen by Dr. Dunn on April 16 where she was counseled on her surgical options. (ECF No. 7-8, p.541). Dr. Dunn examined Plaintiff pre-operatively on April 27, 2010. (ECF No. 7-8, p.540). On April 28, 2010, Plaintiff was admitted for a diagnostic laparoscopy by Dr. Dunn. (ECF No. 7-8, pp.533-538). On laparoscopy, Plaintiff was found to have marked pelvic adhesions which were released, complications of mesh which was excised; her cystocele, rectocele and enterocele were repaired and her left ovary and fallopian tube were removed. (ECF No. 7-8, pp. 533-534).

In a letter dated May 4, 2010, Dr. Dunn opined that Plaintiff's complaints of pain had been validated by the surgery and her limitations are highly accurate and secondary to complications from her 2007 surgery. (ECF NO. 7-8, p.542). Plaintiff followed up with Dr. Dunn on May 6, 2010. (ECF No. 7-8, p.539). At that appointment, Dr. Dunn assessed Plaintiff as healing well, gave her some medication samples and directed her to follow-up in a month. *Id.*

On June 8, 2010 in a follow-up note, Dr. Dunn opined that Plaintiff "is doing really well and continues to have marked improvement." (ECF No. 7-8, p.549). In a letter dated June 15, 2010, Dr. Dunn opined that Plaintiff would require "lying down during the day and the limitations would be that she could only sit an hour at a time and a maximum of four hours a day." (ECF No. 7-8, p.543). Dr. Dunn's July 22, 2010, follow-up notes indicate that Plaintiff was doing "quite well." (ECF No. 548).

In a letter dated July 29, 2011, Dr. Dunn stated that Plaintiff's long-term course "has been one of on-going pain" and opined that "I now feel the maximum work activity she could tolerate in one day would be two hours, regardless of whether she is able to sit, stand, walk and move around as needed." (ECF No. 7-8, p.544). In another letter of the same date, Dr. Dunn states that Plaintiff has had "little improvement since our first visit March 12, 2010." (ECF No. 7-8,

p.545).  Dr. Dunn's chart note of the same date states that Plaintiff is "extremely uncomfortable",

and notes that Plaintiff has been seeing Dr. Schwettmann for obturator injections and continues

to take Utira-C, Neurontin, Flexeril, Oxycontin, Percocet, hydroxyzine and Ambien for her

discomfort.  (ECF No. 7-8, p.546).  Ms. Wilson P.A. reported in a urogynecologic follow-up

clinic note dated August 30, 2010, that Plaintiff presented complaining of unbearable right

buttock pain radiating down her right leg which had kept her bedridden all day.  (ECF NO. 7-8,

p.547).

Dr. Schwettmann performed blocks on Plaintiff's right obturator nerve and to both

sacroiliac joints on: September 28, 2010 (ECF.7-8, p.561 – right obturator nerve); October

13, 2010 (ECF No. 7-8, pp.559-560- right sacroliliac joint); November 15, 2010 (ECF No. 7-8,

p.555 – right obturator nerve); and November 24, 2010 (ECF No. 7-8, pp550-551- both

sacroiliac joints).  Plaintiff received limited relief from these injections.  (See E.g., ECF No. 7-8,

pp.553, 557, 561).

Dr. Parker saw Plaintiff in initial evaluation on September 30, 2010.  (ECF No. 7-8,

pp.576-577).  He noted that Plaintiff reported that she had received good relief from her low

back pain for about three months but it was now returning.  (ECF No. 7-8, p.576).  His physical

examination noted Plaintiff had "no excessive pain behaviors", that backward bending caused

pain in her right lower lumbar and sacroiliac joint, that she had good reflexes and strength and

her straight leg raising was negative.  Id.  Dr. Parker noted that Plaintiff had "exquisite

tenderness to palpation about L4 through SI joints which causes pain in the posterior thigh.

Provocative testing is positive to right SI joint.  She is tender at the right SI and has trigger points

in the piriformis and gluteal musculature, right."  Id.  He further noted that: "she is exquisitely

tender at the right trochanter bursa.  Abdomen extremely tender to even light palpation."  (ECF

No. 7-8, pp.576-577).  Dr. Parker gave Plaintiff a trial prescription for Fentanyl patches but in a follow-up note dated October 6, 2010, discontinued them due to Plaintiff's complaints of resulting headaches and prescribed Percocet.  (ECF No. 7-8, p.577).  Dr. Parker continued to follow Plaintiff through November 2010 with limited relief of her pain.  (ECF No. 7-8, pp. 565-575).

While Plaintiff was receiving nerve blocks from Dr. Schwettmann, she saw Dr. Gerig for a urologic examination on July 8, 2011.  (ECF No. 7-8, p.578).  Dr. Gerig opined that Plaintiff's pain was not due to cystitis but more neurologic in nature.  (ECF No.7-8, p.579).  He recommended pudendal nerve blocks and increasing her Topamax dosage and prescribed a Lidocaine and Flexeril suppository to relax her muscles.  *Id.*

Plaintiff was referred to Dr. Malinky for interventional pain management and first saw him on September 13, 2011.  (ECF No. 7-9, pp.607-609).  On examination he noted Plaintiff had tenderness over her paraspinal muscles and facet joints in her lumbar area; her straight leg test was negative bilaterally; her range of movement for her lumbar spine was 90 degrees flexion but only 15 degrees extension elicited pain and her strength was 5/5 bilaterally.  *Id.*  Dr. Malinky injected Plaintiff's right greater trochanter bursa to decrease the pain and inflammation and planned to do some lumbar facet injections to reduce plaintiff's low back pain.  (ECF No. 7-8, p.607).  Dr. Malinky conducted a lumbar nerve block to Plaintiff's lower back on September 15, 2011.  (ECF No. 7-9, p.604).  Plaintiff had little relief from the injection.  (ECF No. 7-9, pp.601-603).

On September 22, 2011, Dr. Malinky performed a left hypogastric ganglion block which Plaintiff tolerated well.  (ECF NO. 7-9, p.599).  Plaintiff at her September 28, 2011, follow-up appointment reported that her pain was 80% improved.  (ECF No. 7-9, p.597).  However she had

the same block repeated on October 17, 2011. (ECF No. 7-9, p.595). At her follow-up appointment on October 31, 2011, Plaintiff reported a 70% reduction in pain and that she was most improved for a week. (ECF No. 7-9, p.593). On November 1, 20111, Dr. Malinky injected Plaintiff's pudendal nerve. (ECF No. 7-9, p.591). He noted Plaintiff was stable when seen on follow-up on November 16, 2011. (ECF No. 7-9, p.590). On November 21, 2011, Dr. Malinky performed another hypogastric ganglion block which Plaintiff tolerated well. (ECF No. 7-9, p.587). Plaintiff's December 7, 2011 follow-up visit revealed that the November ganglion block did not improve Plaintiff's pain and Dr. Malinky assessed her condition as "worse" then and again at her December 23, 2011 visit. (ECF No. 7-9, pp.585-586; 582-584).

     **C.**    **Administrative Law Judge's Findings:**

The Administrative Law Judge's (ALJ) initial decision issued on June 2, 2010 (ECF 7-4, pp.145-152), was vacated by the Appeals council on January 18, 2012 and remanded for (1) adjudication of the period through Plaintiff's last date insured (June 30, 2010); (2) consideration of Plaintiff's residual functional capacity (RFC) during the entire period with rationale and specific references to the record to be provided in support of assessed limitations; (3) further consideration of whether Plaintiff is capable of performing any of her past relevant work and (4) if warranted, supplemental evidence elicited from the vocational expert (VE) to clarify the effect of the assessed limitations on Plaintiff's occupational base with any hypothetical questions posed to the VE to reflect the specific limitations established by the record as a whole; and (5) a hearing. (ECF No. 7-3, pp.92-93). The ALJ was reminded to identify and resolve any conflicts between the occupational evidence provided by the VE and information in the Dictionary of Occupational Titles (DOT). (*Id.* at p.93).

A hearing was held on May 2, 2012 at which Plaintiff appeared, testified and was represented by her attorney.  (ECF No. 7-2, pp.35-47).  The ALJ issued a subsequent decision on May 29, 2012, finding that Plaintiff was not disabled from April 11, 2007 through her date last insured, June 30, 2010.  (ECF No. 7-2, pp.20-28).

The ALJ determined that plaintiff met the insured status requirements on June 30, 2010, and had not engaged in substantial gainful activity since April 11, 2007.  (ECF No. 7-2, p.22). The ALJ found that Plaintiff had severe impairments of (1) pelvic pain status post-hysterectomy; and (2) sacroiliitis and fibromyalgia.  *Id.*  After consideration of the records including Dr. Sanford's records regarding Plaintiff's affective and anxiety disorders, he found these conditions non-severe.  (ECF No. 7-2, p.23).  The ALJ further found that Plaintiff did not have either an impairment or a combination of impairments that met or medically equaled a listed impairment and had the RFC to perform light work with a sit/stand option and only occasionally bend, squat, kneel and/or climb.  (ECF No. 7-2, p.24).

The ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms not credible to the extent they were inconsistent with the RFC and Dr. Dunn's post-operative medical records.  (ECF No. 7-2, p.26).  With respect to Plaintiff's work limitations, the ALJ gave Dr. Dunn's opinion "little and certainly not controlling weight" because Dr. Dunn's limitations were inconsistent with the radiographic studies showing only mild findings when reviewed by Dr. Leppard and were generally inconsistent with Dr. Dunn's own treatment records.  (ECF No. 7-2, pp.26-27).  The ALJ gave great weight to Dr. Sanford and the state agency psychiatric consultant's opinions as well as those of Dr. Bissell, Dr. Day, Dr. Leppard and Dr. Carroll.  (ECF No. 7-2, p.27).  He also gave the physical consultative

examiner's opinion great weight finding it consistent with the opinions of Plaintiff's treating physicians.  *Id.*

The ALJ then found that Plaintiff was not under a disability because she was capable of her past relevant work as an assistant office manager and bookkeeper which he opined did not include work-related activities that were precluded by Plaintiff's RFC.  *Id.*  He based his finding on the VE's testimony that Plaintiff's past work was at or below the light occupational level and allowed for the sit/stand option with no more than occasional postural limitations.  *Id.*

### III     APPLICABLE LAW and STANDARD OF REVIEW

An individual seeking disability benefits bears the burden of proving a disability.  42 U.S.C. § 423(d)(5).  The Act defines "disabled" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. §423(d)(1)(A).

To meet this burden, a plaintiff must provide medical evidence of both, an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and of the severity of that impairment during the time of his/her alleged disability.  42 U.S.C. § 423(d)(3); 20 C.F.R. §§404.1512(b) and 416.912(b).  A plaintiff is disabled only if his/her impairments are of such severity that s/he is not only unable to do his/her previous work but cannot, considering his/her age, education, and work experience, engage in any other kind of substantial gainful work in the national economy.  42 U.S.C. §423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim.  20 C.F.R. §§404.1520; 416.920; *Williams v. Bowen,* 844 F.2d 748, 750-51 (10th

Cir. 1988). Step One is whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. Step Two is a determination whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show that her medical impairments would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.

Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment is not listed, she is not presumed to be conclusively disabled. Step Four then requires the claimant to show that her impairment(s) prevent her from performing work that she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If not, at Step Five the Commissioner must demonstrate that based on the claimant's residual functional capacity (RFC), age, education and work experience, the claimant can perform other work which is available in significant numbers in the national economy. See 20 C.F.R. §404.1520(g).

In reviewing a decision of the Commissioner, the court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. *Grogan v. Barnhart, 399 F.3d 1257, 1261-62 (10th Cir. 2005).* The court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner even if the court might have reached a different conclusion. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir. 1994).

## IV    DISCUSSION

Plaintiff seeks review arguing that the ALJ failed to properly determine Plaintiff's RFC by ignoring various diagnoses and therefore failing to appreciate the effect of the Plaintiff's impairments upon her ability to function in her past relevant work.  (ECF No.10).  Plaintiff argues that in particular the newly diagnosed evidence evinced by Dr. Dunn post-operatively, was improperly discounted while Drs. Smith and McElhinnery's opinions were given undue weight despite those opinions lacking Dr. Dunn's subsequent operative findings.  (ECF No. 10, pp.26-31).  In doing so, Plaintiff asserts that the ALJ ignored the record which reveals Plaintiff received only temporary relief from physical therapy, acupuncture, massage, nerve blocks, joint injections and therapy.  *Id.*  Plaintiff contends that her non-severe mental and other medically determinable impairments were not addressed in the RFC.  (ECF No.10, pp.16-17).  Finally Plaintiff contends that her credibility was improperly discredited and that analysis was not linked to substantial evidence in the record.  (ECF No. 10, pp.32-37).

Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff retained the ability to perform her past relevant sedentary work.  (ECF 15, pp.19-22).  Defendant argues that this finding is supported by substantial evidence in the record by Plaintiff's treating physicians Drs. Sanford, Bissell, Day, Leppard and Carroll.  *Id.*  Further Defendant argues that the ALJ was reasonable in discounting plaintiff's subjective complaints because the record supports his findings that Plaintiff's daily activities did not indicate significant limitations.  (ECF No. 15, pp.22-24).  Defendant responds that plaintiff did not identify any functional loss related to her mental health or other impairments and therefore the ALJ properly did not impose limitations based on those alleged impairments.  (ECF No. 15, pp.15-18).  Finally, Defendant asserts that the ALJ's statement that he compared Plaintiff's RFC with the physical and mental

demands of her past relevant work was sufficient to support his finding that she was able to perform her past relevant work.  (ECF No. 15, p.24).

An ALJ's factual findings are reviewed to ascertain that the correct legal standards are applied and the determinations are supported by substantial evidence in the record.  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  Substantial evidence is sufficient relevant evidence as a reasonable mind might find adequate to support a conclusion.  *Cowan v. Astrue,* 552 F.3d 1182, 1185 (10th Cir 2008)(substantial evidence is more than a scintilla, but less than a preponderance).

While the court must consider whether the ALJ followed the specific rules of law in weighing particular types of evidence in disability cases, the court will not re-weigh the evidence or substitute its judgment for that of the Commissioner.  *Id.*  Thus, while it may be possible to draw different conclusions from the evidence, the court may not displace the agency's well-supported choice between two conflicting views, even if the court might have made a different choice.  *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir.2007).

In this instance in Step One, the ALJ found the plaintiff met the insured requirements through June 30, 2010 and in Step Two, found that plaintiff had not engaged in substantial gainful activity since April 11, 2007.  (ECF No. 7-2, p.22).  In Step Three, the ALJ found that Plaintiff had severe impairments of pelvic pain status post hysterectomy, sacroiliitis and fibromyalgia and non-severe conditions of affective and anxiety disorders.  (ECF No. 7-2, p.23).

The ALJ determined Plaintiff's RFC based primarily on the functional limitations determined by Drs. Smith, McElhinney, and the records of Plaintiff's treating medical providers.  In determining Plaintiff's RFC, the ALJ also considered Plaintiff's credibility.  Because the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, which is used at

steps Four and Five, "the ALJ's credibility and RFC determinations are inherently intertwined." *Poppa v. Astrue,* 569 F.3d 1167, 1171 (10th Cir, 2009). Thus if as here, Plaintiff establishes a medically determined physical impairment that could reasonably be expected to produce the symptoms of which she complains, the ALJ must evaluate the intensity, persistence, and functionally limiting effects of those symptoms to determine the extent to which the symptoms affect her capacity for work. 20 C.F.R. §404.1529(c)(1).

Plaintiff's challenge to the RFC determination is made on four fronts. No challenge is sufficient to warrant remand or reversal.

First, Plaintiff contends that the ALJ did not consider all medically determinable impairments, both severe and non-severe, in establishing the RFC. In this regard, Plaintiff combs all medical records for reference to any complaint or symptoms from headache to bursitis. Yet, Plaintiff advises of no limitations from such matters and no medical provider set any. The ALJ does not commit error by failing to discuss explicitly every matter raised in a medical record where such matters do not result in limitations and have never been even alleged to be a component of any impairment or disability. This is more like a search for a technical violation without significance.

Of potentially more concern, however, is the claim that the ALJ failed to discuss a medically determinable impairment in his RFC analysis. The argument is based on the ALJ's statement in his Step Four analysis that:

> "As a preliminary matter, claimant's depression and anxiety were determined to be nonsevere and will not be discussed further in this decision."

(ECF No. 7-2, p.26).

But the refusal to "discuss further" was not a refusal to consider. Rather the ALJ was – perhaps unartfully – noting that no limitations flowed from the non-severe mental conditions. Earlier, in his Step Two analysis, the ALJ stated:

> "The mental residual functional capacity assessment used at steps four and five of the sequential evaluation process requires a more detailed assessment . . . . Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraphs B" mental function analysis."

(*Id.*, p.25).

Plaintiff had a mental health Psychiatric Review Technique performed by James Dyde, M.D. (ECF No.7-8, pp.40-52). Dr. Dyde found affective disorders but noted no limitations in restrictions of daily living and no episodes of decompensation. He noted "mild" difficulties in social functioning and in maintaining concentration, persistence or pace. (*Id.*, at p.50). But these mild limitations appear to require no special considerations in employment. As the ALJ noted, Plaintiff herself reported in her Function Report, that she had no issues with respect to memory, completing tasks, concentration, understanding, following instructions or getting along with others. (ECF No. 7-6, p.43). She also reported that her ability to follow instructions was "fine"; that inquiries about her ability to pay attention were "n/a"; and that she got along "good" with authority figures such as bosses. (*Id.*, at pp.43-44). Consistent with this Plaintiff testified that she had worked (not to the level of substantial gainful employment) after her alleged onset date and stopped – not because of any mental limitations or difficulties, but because of physical pain. (ECF No. 7-2, pp.66-67).

To the extent that the ALJ's statement relied upon by Plaintiff may suggest that further discussion of Plaintiff's mental condition was not required because it was non-severe, the statement is a technical error. But I conclude that the error, if any, was harmless. No functional loss related to employment which would alter the RFC was found. None was claimed by

Plaintiff.  Her brief makes no suggestion that any exists.  *See McAnally v. Astrue,* 241 F.App'X 515, 518 (10th Cir. 2007)(unpublished).

Next Plaintiff argues that the "ALJ Violated Medical Opinion Standards."  (ECF No. 10, pp.26-32).  Despite that label, Plaintiff's argument reduces down to disagreement with the ALJ's decision to afford "little, and certainly not controlling weight" to the opinions expressed in Dr. Dunn's letters written in and after June 2010.  The ALJ afforded little weight to those letters because they were "inconsistent with the radiographic studies reviewed by Dr. Leppard" and not supported by "his own [Dr. Dunn's] treatment records."  (ECF No. 7-2, pp.27-28).  Plaintiff's disagreement amounts to a request that the court reweigh the evidence.  This the court cannot do.  *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir. 2007).  The ALJ gave valid reasons for discounting Dr. Dunn's opinion letters.

Finally, and this is the true crux of the dispute between the parties, Plaintiff claims that the ALJ made a faulty credibility determination with respect to Plaintiff's allegations of pain.  It is pain that Plaintiff contends precludes her ability to work.  The ALJ found medical impairments which would produce pain, but disagreed with Plaintiff's interpretation of the intensity and persistence of such pain.

In considering credibility, the ALJ must make a finding with regard to Plaintiff's statements about her symptoms and their functional effects."  SSR 96-7P, 1996 WL 374186 at *1 (July 2, 1996).  Factors the ALJ may consider include the levels of her medication and its effectiveness, the frequency of her medical contacts, the nature of her daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, and the consistency or compatibility of nonmedical testimony with objective medical evidence.  *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995)(internal citations omitted).

In this instance there is evidence that could be viewed as supporting claimant's position in that she has: consistently sought medical treatment and undergone several surgeries for her back and pelvic pain; she has attended physical therapy and massage sessions and she takes medication to relieve her pain.  However, credibility determinations are peculiarly the province of the finder of fact, and the court will not upset such determinations when they supported by and linked to substantial evidence and not just a conclusion in the guise of findings.  *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 744, 777 (10th Cir. 1990)(citing *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988)).

In this instance, I find the ALJ adequately linked the medical evidence and his credibility determination.  (ECF No. 7-2, pp.24-27).  In finding the plaintiff has the RFC to perform light work as defined in 20 C.F.R. §404.1567(b) including a sit/stand option and only occasional bending, squatting, kneeling and climbing, the ALJ detailed the evidence supporting this finding including a synopsis of Plaintiff's treating physicians' findings and references to Plaintiff's extensive medical record.  (ECF No.7-2, pp.25-27).  He also explained the reasons he accorded various weights to the doctors' opinions including a detailed explanation of why he gave Dr. Dunn's letter opinions little weight.  *Id.*  Finally, the ALJ concluded that based on the record, Plaintiff's testimony and that of the VE, Plaintiff was capable of performing her past relevant work as an assistant office manager or bookkeeper and was therefore not disabled from April 11, 2007 through June 30, 2010.  (ECF No. 7-2, p.27).

Plaintiff, citing *Henrie v. Dept. of Health & Human Servs.,* 13 F.3d 359 (10th Cir. 1993), contends  that the ALJ's findings were deficient with respect to Plaintiff's RFC, the physical and mental demands of prior jobs, and the ability of Plaintiff to return to prior work given her RFC. The argument is not individually developed, but merely stated as the product of other claimed

errors.  *See* ECF No. 10, p.37.  As the court finds no error with respect to the other claimed

matters, no *Henrie* error is found either.

      As noted above, this appeal is largely about differing opinions as to the weight to be

given to particular evidence.  This court is not at liberty to re-weigh the evidence but is limited to

determining whether the correct legal standards were applied and the decision is supported by

substantial evidence in the record.  After a complete review of the record, I find the ALJ's

findings are supported by substantial evidence in the record, are free of harmful error and

supported by the correct legal standards.

### IV     CONCLUSION

      For the reasons detailed above, the Commissioner's January 8, 2014, final decision is

AFFIRMED.

IT IS SO ORDERED

      DATED this 29th day of March, 2016.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge